CV 10 4244

Rodney & Dawn Chestnut
112 W Bartlett Road
Middle Island , NY 11953

FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y

SEP 17 2010  ★

# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF NEW YORK

LONG ISLAND OFFICE

| | |
|---|---|
| **Rodney & Dawn Chestnut** | Case # _____ |
| Plaintiff, | |
| vs. | **PETITION FOR TEMPORARY** |
| **Wells Fargo Bank, N.A** | **INJUNCTION** |
| Defendant | SEYBERT, J |
| | LINDSAY, M |

Date: _____

Comes now Rodney & Dawn Chestnut , hereinafter referred to as "Petitioner," and moves the court for relief as herein requested:

## PARTIES

Petitioner is Rodney & Dawn Chestnut , 112 W Bartlett Road   Middle Island  NY 11953.
Currently Known Defendant(s) are/is:  Wells Fargo Bank, N.A

## STATEMENT OF CAUSE

Petitioner, entered into a consumer contract for the refinance of a primary residence located at

112 W Bartlett Road  , hereinafter referred to as the "property."

Defendants, acting in concert and collusion with others, induced Petitioner to enter into a predatory loan agreement with Defendant.

Defendants committed numerous acts of fraud against Petitioner in furtherance of a carefully crafted scheme intended to defraud Petitioner.

Defendants failed to make proper notices to Petitioner that would have given Petitioner warning of the types of tactics used by Defendants to defraud Petitioner.

Defendants charged false fees to Petitioner at settlement.

24 Defendants used the above referenced false fees to compensate agents of Petitioner in order to
25 induce said agents to breach their fiduciary duty to Petitioner.

26 Defendant's attorney caused to be initiated collection procedures, knowing said collection
27 procedures in the instant action were frivolous as lender is estopped from collection procedures,
28 under authority of Uniform Commercial Code 3-501, subsequent to the request by Petitioner for
29 the production of the original promissory note alleged to create a debt.

30                                   **IN BRIEF**
31                        *(Non-factual Statement of Posture and Position)*

32 It is not the intent of Petitioner to indict the entire industry. It is just that Plaintiff will be
33 making a number of allegations that, outside the context of the current condition of the real
34 estate industry, may seem somewhat outrageous and counter-intuitive.

35 When Petitioner accuses ordinary individuals of acting in concert and collusion with an
36 ongoing criminal conspiracy, it tends to trigger an incredulous response as it is
37 unreasonable to consider that all Agents, loan agents, appraisers, and other ordinary
38 people, just doing what they have been trained to do, are out to swindle the poor
39 unsuspecting borrower.

40 The facts Petitioner is prepared to prove are that Petitioner has been harmed by fraud
41 committed by people acting in concert and collusion, one with the other. Petitioner has no
42 reason to believe that the Agent, loan officer, appraiser, and others were consciously aware
43 that what they were doing was part of an ongoing criminal conspiracy, only that it was,
44 and they, at the very least, kept themselves negligently uninformed of the wrongs they
45 were perpetrating. Petitioner maintains the real culprit is the system itself, including the
46 courts, for failure to strictly enforce the consumer protection laws.

47                   **CAREFULLY CRAFTED CRIMINAL CONNIVANCE**
48                        *(General State of the Real Estate Industry)*

49 ***THE BEST OF INTENTIONS***

50 Prior to the 1980's and 1990's ample government protections were in place to protect
51 consumers and the lending industry from precisely the disaster we now experience.
52 During President Clinton's administration, under the guise of making housing available to

53 the poor, primary protections were relaxed which had the effect of releasing the
54 unscrupulous on the unwary.

55 Prior to deregulation in the 1980's, lenders created loans for which they held and assumed
56 the risk. Consequently, Americans were engaged in safe and stable home mortgages.
57 With the protections removed, the unscrupulous lenders swooped in and, instead of
58 making loans available to the poor, used the opportunity to convince the unsophisticated
59 American public to do something that had been traditionally taboo; home buyers were
60 convinced to speculate with their homes, their most important investment.

61 Wells Fargo Bank, N.A , Ameriquest, Countrywide, and many others swooped in and
62 convinced Americans to sell their homes, get out of their safe mortgage agreements, and
63 speculate with the equity they had gained by purchasing homes they could not afford.
64 Lenders created loans intended to fail as, under the newly crafted system, the Lender
65 profited more from a mortgage default than from a stable loan.

66 Companies cropped up who called themselves banks when, in fact, they were only either
67 subsidiaries of banks, or unaffiliated companies that were operated for the purpose of
68 creating and selling promissory notes. As will be demonstrated, these companies then
69 profited from the failure of the underlying loans.

70 **_HOW IT WORKS_**

71 Briefly, how it works is this, the Lender would secure a large loan from a large bank,
72 convert that loan into 20 and 30 year mortgages and then sell the promise to pay to an
73 investor.

74 People would set up mortgage companies by securing a large loan from one of the major
75 banks, then convert that loan into 20 and 30 year mortgages. In order to accomplish this
76 an Agent would contract with a seller to find a buyer, bring both seller and buyer to a
77 lender who would secure the title from the seller using the borrowed bank funds for that
78 purpose, and then trade the title to the buyer in exchange for a promissory note.

79 The lender then creates a 20 or 30 year mortgage with money the lender must repay within
80 6 months. As soon as the closing is consummated, the promissory note is sold to an
81 investor pool.

82 Using the instant case as an example, a $280,000.00 note at 10.7580%% interest over 30
83 years will produce $178,382.64      The lender can then offer to the investor the security

PRELIMINARY INJUNCTION                    3 of 26

84    instrument (promissory note) at say 50% of it's future value. The investor will, over the
85    life of the note, less approximately 3.00% servicing fees, realize $466,081.30 . The lender
86    can then pay back the bank and retain a handsome profit in the amount of $214,911.07.
87    The lender, however, is not done with the deal.

88    The lender signed over the promissory note to the investor at the time of the trade, but did
89    not sign over the lien document (mortgage or deed of trust). The State of Kansas Supreme
90    Court addressed this issue and stated that such a transaction was certainly legal. However,
91    it created a fatal flaw as the holder of the lien document, at time of sale of the security
92    instrument, received consideration in excess of the lien amount. Since the lien holder
93    received consideration, he could not be harmed. Therefore the lien became an
94    unenforceable document.

95    This begs the question: if keeping the lien would render it void, why would the lender not
96    simply transfer the lien with the promissory note? The reason is because the lender will
97    hold the lien for three years, file an Internal Revenue Service Form 1099a, claim the full
98    amount of the lien as abandoned funds, and deduct the full amount from the lender's tax
99    liability. The lender, by this maneuver, gets consideration a second time. And still the
100    lender is not done profiting from the deal.

101    After sale of the promissory note, the lender remains as the servicer for the investor. The
102    lender will receive 3% of each payment the lender collects and renders to the investor
103    pool. However, if the payment is late, the lender is allowed to assess an extra 5% and keep
104    that amount. Also, if the loan defaults, the lender stands to gain thousands for handling the
105    foreclosure.

106    The lender stands to profit more from a note that is overly expensive, than from a good
107    stable loan. And where, you may ask, does all this profit come from? It comes from the
108    equity the borrower had built up in the home. And still the lender is not finished profiting
109    from the deal.

110    Another nail was driven in the American financial coffin when on the last day Congress
111    was in session in 2000 when restrictions that had been in place since the economic
112    collapse of 1907 were removed. Until 1907 investors were allowed to bet on stocks
113    without actually buying them. This unbridled speculation led directly to an economic
114    collapse. As a result the legislature banned the practice, until the year 2000. In 2000 the
115    unscrupulous lenders got their way on the last day of the congressional session. Congress

PRELIMINARY INJUNCTION      4 of 26

116  removed the restriction banning derivatives and again allowed the practice, this time
117  taking only 8 years to crash the stock market. This practice allowed the lender to profit
118  further from the loan by betting on the failure of the security instrument he had just sold to
119  the unwary investor, thus furthering the purpose of the lender to profit from both the
120  borrower (consumer) and the investor.

121  The failure of so many loans recently resulted in a seven hundred and fifty billion dollar
122  bailout at the expense of the taxpayer. The unsuspecting consumer was lulled into
123  accepting the pronouncements of the lenders, appraisers, underwriters, and trustees as all
124  were acting under the guise of government regulation and, therefore, the borrower had
125  reason to expect good and fair dealings from all. Unfortunately, the regulations in place to
126  protect the consumer from just this kind of abuse were simply being ignored.

127  The loan origination fee from the HUD1 settlement statement is the finder's fee paid for
128  the referral of the client to the lender by a person acting as an agent for the borrower.
129  Hereinafter, the person or entity who receives any portion of the yield spread premium, or
130  a commission of any kind consequent to securing the loan agreement through from the
131  borrower will be referred to as "Agent." The fee, authorized by the consumer protection
132  law is restricted to 1% of the principal of the note. It was intended that the Agent, when
133  seeking out a lender for the borrower, would seek the best deal for his client rather than
134  who would pay him the most. That was the intent, but not the reality. The reality is that
135  Agents never come away from the table with less than 2% or 3% of the principal. This is
136  accomplished by undisclosed fees to the Agent in order to induce the Agent to breach his
137  fiduciary duty to the borrower and convince the borrower to accept a more expensive loan
138  product than the borrower qualifies for. This will generate more profits for the lender and,
139  consequently, for the Agent.

140  It is a common practice for lenders to coerce appraisers to give a higher appraisal than is
141  the fair market price. This allows the lender to increase the cost of the loan product and
142  give the impression that the borrower is justified in making the purchase.

143  The lender then charges the borrower an underwriting fee in order to convince the
144  borrower that someone with knowledge has gone over the conditions of the note and
145  certified that they meet all legal criteria. The trustee, at closing, participates actively in the
146  deception of the borrower by placing undue stress on the borrower to sign the large stack
147  of paperwork without reading it. The trustee is, after all, to be trusted and has been paid to

148    insure the transaction. This trust is systematically violated for the purpose of taking unfair
149    advantage of the borrower. The entire loan process is a carefully crafted contrive
150    connivance designed and intended to induce the unsophisticated borrower into accepting a
151    loan product that is beyond the borrowers means to repay. With all this, it should be a
152    surprise to no one that this country is having a real estate crisis.

153                              **PETITIONER WILL PROVE THE FOLLOWING**
154    Petitioner is prepared to prove, by a preponderance of evidence that:

155    • Lender has no legal standing to bring collection or foreclosure claims against the
156      property;

157    • Lender is not a real party in interest in any contract which can claim a collateral
158      interest in the property;

159    • even if Lender were to prove up a contract to which Lender had standing to enforce
160      against Petitioner, no valid lien exists which would give Lender a claim against the
161      property;

162    • even if Lender were to prove up a contract to which Lender had standing to enforce
163      against Petitioner, said contract was fraudulent in its creation as endorsement was
164      secured by acts of negligence, common law fraud, fraud by non-disclosure, fraud in
165      the inducement, fraud in the execution, usury, and breaches of contractual and
166      fiduciary obligations by Mortgagee or "Trustee" on the Deed of Trust, "Mortgage
167      Agents," "Loan Originators," "Loan Seller," "Mortgage Aggregator," "Trustee of
168      Pooled Assets," "Trustee or officers of Structured Investment Vehicle,"
169      "Investment Banker," "Trustee of Special Purpose Vehicle/Issuer of Certificates of
170      'Asset-Backed Certificates,'" "Seller of 'Asset-Backed' Certificates (shares or
171      bonds)," "Special Servicer" and Trustee, respectively, of certain mortgage loans
172      pooled together in a trust fund;

173    • Defendants have concocted a carefully crafted connivance wherein Lender
174      conspired with Agents, et al, to strip Petitioner of Petitioner's equity in the property
175      by inducing Plaintiff to enter into a predatory loan inflated loan product;

176    • Lender received unjust enrichment in the amount of 5% of each payment made late
177      to Lender while Lender and Lender's assigns acted as servicer of the note;

178     • Lender and Lender's assigns, who acted as servicer in place of Lender, profited by
179        handling the foreclosure process on a contract Lender designed to have a high
180        probability of default;

181     • Lender intended to defraud Investor by converting the promissory note into a
182        security instrument and selling same to Investor;

183     • Lender intended to defraud Investor and the taxpayers of the United States by
184        withholding the lien document from the sale of the promissory note in order that
185        Lender could then hold the lien for three years, then prepare and file Internal
186        Revenue Form 1099a and falsely claim the full lien amount as abandoned funds
187        and deduct same from Lender's income tax obligation;

188     • Lender defrauded backers of derivatives by betting on the failure of the promissory
189        note the lender designed to default;

190     • participant Defendants, et al, in the securitization scheme described herein have
191        devised business plans to reap millions of dollars in profits at the expense of
192        Petitioner and others similarly situated.

193                          **PETITIONER SEEKS REMEDY**

194   In addition to seeking compensatory, consequential and other damages, Petitioner seeks
195   declaratory relief as to what (if any) party, entity or individual or group thereof is the
196   owner of the promissory note executed at the time of the loan closing, and whether the
197   Deed of Trust (Mortgage) secures any obligation of the Petitioner, and a Mandatory
198   Injunction requiring re-conveyance of the subject property to the Petitioner or, in the
199   alternative a Final Judgment granting Petitioner Quiet Title in the subject property.

200   ***PETITIONER HAS BEEN HARMED***

201   Petitioner has suffered significant harm and detriment as a result of the actions of Defendants.

202   Such harm and detriment includes economic and non-economic damages, and injuries to
203   Petitioner's mental and emotional health and strength, all to be shown according to proof at trial.

204   In addition, Petitioner will suffer grievous and irreparable further harm and detriment unless the
205   equitable relief requested herein is granted.

206    **STATEMENT OF CLAIM**

207    *DEFENDANTS LACK STANDING*

208    **No evidence of Contractual Obligation**

209    Defendants claim a controversy based on a contractual violation by Petitioner but have failed to
210    produce said contract. Even if Defendants produced evidence of the existence of said contract in
211    the form of an allegedly accurate photocopy of said document, a copy is only hearsay evidence
212    that a contract actually existed at one point in time. A copy, considering the present state of
213    technology, could be easily altered. As Lender only created one original and that original was
214    left in the custody of Lender, it was imperative that Lender protect said instrument.

215    In as much as the Lender is required to present the original on demand of Petitioner, there can be
216    no presumption of regularity when the original is not so produced.   In as much as Lender has
217    refused Petitioner's request of the chain of custody of the security instrument in question by
218    refusing to identify all current and past real parties in interest, there is no way to follow said
219    chain of custody to insure, by verified testimony, that no alterations to the original provisions in
220    the contract have been made.    Therefore, the alleged copy of the original is only hearsay
221    evidence that an original document at one time existed. Petitioner maintains that, absent
222    production of admissible evidence of a contractual obligation on the part of Petitioner,
223    Defendants are without standing to invoke the subject matter jurisdiction of the court.

224    **No Proper Evidence of Agency**

225    Defendants claim agency to represent the principal in a contractual agreement involving
226    Petitioner, however, Defendants have failed to provide any evidence of said agency other than a
227    pronouncement that agency has been assigned by some person, the true identity and capacity of
228    whom has not been established. Defendants can hardly claim to be agents of a principal then
229    refuse to identify said principal. All claims of agency are made from the mouth of the agent with
230    no attempt to provide admissible evidence from the principal.

231    Absent proof of agency, Defendants lack standing to invoke the subject matter jurisdiction of the
232    court.

233      **Special Purpose Vehicle**

234      Since the entity now claiming agency to represent the holder of the security instrument is not the
235      original lender, Petitioner has reason to believe that the promissory note, upon consummation of
236      the contract, was converted to a security and sold into a special purpose vehicle and now resides
237      in a Real Estate Mortgage Investment Conduit (REMIC)     as defined by the Internal Revenue
238      Code and as such, cannot be removed from the REMIC as such would be a prohibited
239      transaction.      If the mortgage was part of a special purpose vehicle and was removed on
240      consideration of foreclosure, the real party in interest would necessarily be the trustee of the
241      special purpose vehicle. Nothing in the pleadings of Defendants indicates the existence of a
242      special purpose vehicle, and the lack of a proper chain of custody documentation gives Petitioner
243      cause to believe defendant is not the proper agent of the real party in interest.

244      *CRIMINAL CONSPIRACY AND THEFT*

245      Defendants, by and through Defendant's Agents, conspired with other Defendants, et al, toward
246      a criminal conspiracy to defraud Petitioner.  Said conspiracy but are not limited to acts of
247      negligence, breach of fiduciary duty, common law fraud, fraud by non-disclosure, and tortuous
248      acts of conspiracy and theft, to include but not limited to, the assessment of improper fees to
249      Petitioner by Lender, which were then used to fund the improper payment of commission fees to
250      Agent in order to induce Agent to violate Agent's fiduciary duty to Petitioner.

251      *AGENT PRACTICED UP-SELLING*

252      By and through the above alleged conspiracy, Agent practiced up-selling to Petitioner. In so
253      doing, Agent violated the trust relationship actively cultivated by Agent and supported by fact
254      that Agent was licensed by the state. Agent further defrauded Petitioner by failing to disclose
255      Agent's conspiratorial relationship to Lender,  Agent violated Agent's fiduciary duty to
256      Petitioner and the duty to provide fair and honest services, through a series of carefully crafted
257      connivances, wherein Agent proactively made knowingly false and misleading statements of
258      alleged fact to Petitioner, and by giving partial disclosure of facts intended to directly mislead
259      Petitioner for the purpose of inducing Petitioner to make decisions concerning the acceptance of
260      a loan product offered by the Lender. Said loan product was more expensive than Petitioner
261      could legally afford. Agent acted with full knowledge that Petitioner would have made a
262      different decision had Agent given complete disclosure.

263     ***FRAUDULENT INDUCEMENT***

264     Lender maliciously induced Petitioner to accept a loan product, Lender knew, or should have
265     known, Petitioner could not afford in order to unjustly enrich Lender.

266     ***EXTRA PROFIT ON SALE OF PREDATORY LOAN PRODUCT***

267     Said more expensive loan product was calculated to produce a higher return when sold as a
268     security to an investor who was already waiting to purchase the loan as soon as it could be
269     consummated.

270         **Extra Commission for Late Payments**

271     Lender acted with deliberate malice in order to induce Petitioner to enter into a loan agreement
272     that Lender intended Petitioner would have difficulty paying. The industry standard payment to
273     the servicer for servicing a mortgage note is 3% of the amount collected. However, if the
274     borrower is late on payments, a 5% late fee is added and this fee is retained by the servicer.
275     Thereby, the Lender stands to receive more than double the regular commission on collections if
276     the borrower pays late.

277         **Extra Income for Handling Foreclosure**

278     Lender acted with deliberate malice in order to induce petitioner to enter into a loan agreement
279     on which Lender intended petitioner to default. In case of default, the Lender, acting as servicer,
280     receives considerable funds for handling and executing the foreclosure process.

281         **Credit Default Swap Gambling**

282     Lender, after deliberately creating a loan intended to default is now in a position to bet on credit
283     default swap, commonly referred to as a derivative as addressed more fully below. Since Lender
284     designed the loan to fail, betting on said failure is essentially a sure thing.

285     ***LENDER ATTEMPTING TO FRAUDULENTLY COLLECT ON VOID LIEN***

286     Lender sold the security instrument after closing and received consideration in an amount in
287     excess of the lien held by Lender. Since Lender retained the lien document upon the sale of the
288     security instrument, Lender separated the lien from said security instrument, creating a fatal and
289     irreparable flaw.

290 When Lender received consideration while still holding the lien and said consideration was in
291 excess of the amount of the lien, Lender was in a position such that he could not be harmed and
292 could not gain standing to enforce the lien. The lien was, thereby, rendered void.

293 Since the separation of the lien from the security instrument creates such a considerable concern,
294 said separation certainly begs a question: "Why would the Lender retain the lien when selling the
295 security instrument?"

296 When you follow the money the answer is clear. The Lender will hold the lien for three years,
297 then file an IRS Form 1099a and claim the full amount of the lien as abandoned funds and deduct
298 the full amount from Lender's tax liability, thereby, receiving consideration a second time.

299 Later, in the expected eventuality of default by petitioner, Lender then claimed to transfer the
300 lien to the holder of the security, however, the lien once satisfied, does not gain authority just
301 because the holder, after receiving consideration, decides to transfer it to someone else.

302 ### *LENDER PROFIT BY CREDIT DEFAULT SWAP DERIVATIVES*

303 Lender further stood to profit by credit default swaps in the derivatives market, by way of inside
304 information that Lender had as a result of creating the faulty loans sure to default. Lender was
305 then free to invest on the bet that said loan would default and stood to receive unjust enrichment
306 a third time. This credit default swap derivative market scheme is almost totally responsible for
307 the stock market disaster we now experience as it was responsible for the stock market crash in
308 1907.

309 ### *LENDER CHARGED FALSE FEES*

310 Lender charged fees to Petitioner that were in violation of the limitations imposed by the Real
311 Estate Settlement Procedures Act as said fees were simply contrived and not paid to a third party
312 vendor.

313 Lender charged other fees that were a normal part of doing business and should have been
314 included in the finance charge.

315 Below is a listing of the fees charged at settlement. Neither at settlement, nor at any other time
316 did Lender or Trustee provide documentation to show that the fees herein listed were valid,
317 necessary, reasonable, and proper to charge Petitioner.

| 801 | Broker Fee | $5,950.00 |
|------|-----------|-----------|
| 802 | Credit Report Fee | $9.65 |
| 803 | Processing Fee | $645.00 |
| 805 | Underwriting Fee | $894.00 |
| 807 | Tax Service Fee | $60.00 |
| 810 | Flood Cert Fee | $9.50 |
| 901 | Interest from08/15/2005 to 9/1/2005@ $/62.90day | $1,069.30 |
| 1101 | Settlement Fee | $850.00 |
| 1106 | Courier Fee | $35.00 |
| 1110 | Lender's Coverage | $944.00 |
| 1111 | Endorsements Fee | $181.00 |
| 1112 | Departmental Fee | $1,345.00 |
| 1201 | Recording Fee | $375.00 |
| 1202 | City/county tax/stamp | $2,210.00 |
| 1203 | Certified Check Fee | $35.00 |
| 1205 | Sat of Judgments Fee | $130.00 |
| 1301 | Open Taxes 1 1/2 | $4,695.12 |

318  Debtor is unable to determine whether or not the above fees are valid in accordance with the
319  restrictions provided by the various consumer protection laws. Therefore, please provide; a
320  complete billing from each vendor who provided the above listed services; the complete contact
321  information for each vendor who provided a billed service; clearly stipulate as to the specific
322  service performed; a showing that said service was necessary; a showing that the cost of said
323  service is reasonable; a showing of why said service is not a regular cost of doing business that
324  should rightly be included in the finance charge.

325  The above charges are hereby disputed and deemed unreasonable until such time as said charges
326  have been demonstrated to be reasonable, necessary, and in accordance with the limitations and
327  restrictions included in any and all laws, rules, and regulations intended to protect the consumer.

328  In the event lender fails to properly document the above charges, borrower will consider same as
329  false charges. The effect of the above amounts that borrower would pay over the life of the note
330  will be an overpayment of $502,609.73 This amount will be reduced by the amount of items
331  above when said items are fully documented.

332  ***RESPA PENALTY***

333  From a cursory examination of the records, with the few available, the apparent RESPA
334  violations are as follows: Good Faith Estimate not within limits, No HUD-1 Booklet, Truth In
335  Lending Statement not within limits compared to Note, Truth in Lending Statement not timely
336  presented, HUD-1 not presented at least one day before closing, No Holder Rule Notice in Note,
337  No 1st Payment Letter.

338    The closing documents included no signed and dated : Financial Privacy Act Disclosure; Equal
339    Credit Reporting Act Disclosure; notice of right to receive appraisal report; servicing disclosure
340    statement; borrower's Certification of Authorization; notice of credit score; RESPA servicing
341    disclosure letter; loan discount fee disclosure; business insurance company arrangement
342    disclosure; notice of right to rescind.

343    The courts have held that the borrower does not have to show harm to claim a violation of the
344    Real Estate Settlement Procedures Act, as the Act was intended to insure strict compliance. And,
345    in as much as the courts are directed to assess a penalty of no less than two hundred dollars and
346    no more than two thousand, considering the large number enumerated here, it is reasonable to
347    consider that the court will assess the maximum amount for each violation.

348    Since the courts have held that the penalty for a violation of RESPA accrues at consummation of
349    the note, borrower has calculated that, the number of violations found in a cursory examination
350    of the note, if deducted from the principal, would result in an overpayment on the part of the
351    borrower, over the life of the note, of $545,619.49.

352    If the violation penalty amounts for each of the unsupported fees listed above are included, the
353    amount by which the borrower would be defrauded is $551,168.00

354    Adding in RESPA penalties for all the unsupported settlement fees along with the TILA/Note
355    variance, it appears that lender intended to defraud borrower in the amount of $2,110,217.46

356    *LENDER CONSPIRED WITH APPRAISER*

357    Lender, in furtherance of the above referenced conspiracy, conspired with appraiser for the
358    purpose of preparing an appraisal with a falsely stated price, in violation of appraiser's fiduciary
359    duty to Petitioner and appraiser's duty to provide fair and honest services, for the purpose of
360    inducing Petitioner to enter into a loan product that was fraudulent toward the interests of
361    Petitioner.

362    *LENDER CONSPIRED WITH TRUSTEE*

363    Lender conspired with the trust Agent at closing to create a condition of stress for the specific
364    purpose of inducing Petitioner to sign documents without allowing time for Petitioner to read and
365    fully understand what was being signed.

366   The above referenced closing procedure was a carefully crafted connivance, designed and
367   intended to induce Petitioner, through shame and trickery, in violation of trustee's fiduciary duty
368   to Petitioner and the duty to provide fair and honest services, to sign documents that Petitioner
369   did not have opportunity to read and fully understand, thereby, denying Petitioner full disclosure
370   as required by various consumer protection statutes.

371   *DECEPTIVE ADVERTISING AND OTHER UNFAIR BUSINESS PRACTICES*

372   In the manner in which Defendants have carried on their business enterprises, they have engaged
373   in a variety of unfair and unlawful business practices prohibited by *15 USC Section 45* et seq.
374   (Deceptive Practices Act).

375   Such conduct comprises a pattern of business activity within the meaning of such statutes, and
376   has directly and proximately caused Petitioner to suffer economic and non-economic harm and
377   detriment in an amount to be shown according to proof at trial of this matter.

378   *EQUITABLE TOLLING FOR TILA AND RESPA*

379   The Limitations Period for Petitioners' Damages Claims under TILA and RESPA should be
380   Equitably Tolled due to the DEFENDANTS' Misrepresentations and Failure to Disclose.

381   Any claims for statutory and other money damages under the Truth in Lending Act *(15 U.S.C. §*
382   *1601,* et. seq.) and under the Real Estate Settlement Procedures Act *(12 U.S.C. § 2601* et. seq.)
383   are subject to a one-year limitations period; however, such claims are subject to the equitable
384   tolling doctrine. The Ninth Circuit has interpreted the TILA limitations period in § 1640(e) as
385   subject to equitable tolling. In *King v. California, 784 F.2d 910 (9th Cir.1986),* the court held
386   that given the remedial purpose of TILA, the limitations period should run from the date of
387   consummation of the transaction, but that "the doctrine of equitable tolling may, in appropriate
388   circumstances, suspend the limitations period until the borrower discovers or has reasonable
389   opportunity to discover the fraud or nondisclosures that form the basis of the TILA action." *King*
390   *v. California, 784 F.2d 910, 915 9t*h Cir. 1986).

391   Likewise, while the Ninth Circuit has not taken up the question whether *12 U.S.C. § 2614,* the
392   anti-kickback provision of **RESPA,** is subject to equitable tolling, other Courts have, and hold
393   that such limitations period may be equitably tolled. The Court of Appeals for the District of
394   Columbia held that § 2614 imposes a strictly jurisdictional limitation, *Hardin v. City Title &*

395    *Escrow Co., 797 F.2d 1037, 1039-40 (D.C. Cir. 1986),* while the Seventh Circuit came to the
396    opposite conclusion. *Lawyers Title Ins. Corp. v. Dearborn Title Corp., 118 F.3d 1157, 1164 (7th*
397    *Cir. 1997).* District courts have largely come down on the side of the Seventh Circuit in holding
398    that the one-year limitations period in § 2614 is subject to equitable tolling. See, e.g., *Kerby v.*
399    *Mortgage Funding Corp., 992 F.Supp. 787, 791-98 (D.Md.1998); Moll v. U.S. Life Title Ins. Co.,*
400    *700 F.Supp. 1284, 1286-89 (S.D.N.Y.1988).* Importantly, the Ninth Circuit, as noted above, has
401    interpreted the TILA limitations period in *15 U.S.C. § 1640* as subject to equitable tolling; the
402    language of the two provisions is nearly identical. *King v. California, 784 F.2d at 914.* While not
403    of precedential value, this Court has previously found both the TILA and **RESPA** limitations
404    periods to be subject to equitable tolling. *Blaylock v. First American Title Ins. Co., 504*
405    *F.Supp.2d 1091,* (W.D. Wash. 2007). 1106-07.

406    The Ninth Circuit has explained that the doctrine of equitable tolling "focuses on excusable delay
407    by the Petitioner," and inquires whether "a reasonable Petitioner would ... have known of the
408    existence of a possible claim within the limitations period." *Johnson v. Henderson, 314 F.3d*
409    *409, 414 (9th Cir.2002), Santa Maria v. Pacific Bell, 202 F.3d 1170, 1178 (9th Cir.2000).*
410    Equitable tolling focuses on the reasonableness of the Petitioner's delay and does not depend on
411    any wrongful conduct by the Defendants. Santa Maria. at 1178.

412    *BUSINESS PRACTICES CONCERNING DISREGARDING OF UNDERWRITING*
413    *STANDARDS*

414    Traditionally, Lenders required borrowers seeking mortgage loans to document their income and
415    assets by, for example, providing W-2 statements, tax returns, bank statements, documents
416    evidencing title, employment information, and other information and documentation that could
417    be analyzed and investigated for its truthfulness, accuracy, and to determine the borrower's
418    ability to repay a particular loan over both the short and long term. Defendants deviated from and
419    disregarded these standards, particularly with regard to its riskier and more profitable loan
420    products.

421    **Low-Documentation/No-Documentation Loans.**

422    Driven by its desire for market share and a perceived need to maintain competitiveness with the
423    likes of Countrywide, Defendants began to introduce an ever increasing variety of low and no
424    documentation loan products, including the ARMs and HELOCs described hereinabove, and
425    began to deviate from and ease its underwriting criteria, and then to grant liberal exceptions to
       PRELIMINARY INJUNCTION          15 of 26

426 the already eased underwriting standards to the point of disregarding such standards. This
427 quickened the loan origination process, allowing for the generation of more and more loans
428 which could then be resold and/or securitized in the secondary market.

429 Defendants marketed no-documentation/low-documentation loan programs that included ARMs
430 and HELOCs, among others, in which loans were given based on the borrower's "stated income"
431 or "stated assets" (SISA) neither of which were verified. Employment was verbally confirmed, if
432 at all, but not further investigated, and income, if it was even considered as a factor, was to be
433 roughly consistent with incomes in the types of jobs in which the borrower was employed. When
434 borrowers were requested to document their income, they were able to do so through information
435 that was less reliable than in a full-documentation loan.

436 For stated income loans, it became standard practice for loan processors, loan officers and
437 underwriters to rely on www.salary.com to see if a stated income was reasonable. Such stated
438 income loans, emphasizing loan origination from a profitability standpoint at the expense of
439 determining the ability of the borrower to repay the loan from an underwriting standpoint,
440 encouraged the overstating and/or fabrication of income.

441     **Easing of Underwriting Standards**

442 In order to produce more loans that could be resold in the secondary mortgage market,
443 Defendants also relaxed, and often disregarded, traditional underwriting standards used to
444 separate acceptable from unacceptable risk. Examples of such relaxed standards were reducing
445 the base FICO score needed for a SISA loan.

446 Other underwriting standards that Defendants relaxed included qualifying interest rates (the rate
447 used to determine whether borrowers can afford the loan), loan to value ratios (the amount of
448 loan(s) compared to the appraised/sale price of the property, whichever is lower), and debt-to-
449 income ratios (the amount of monthly income compared to monthly debt service payments and
450 other monthly payment obligations.

451 With respect to ARMS, Defendants underwrote loans without regard to the borrower's long-term
452 financial circumstances, approving the loan based on the initial fixed rate without taking into
453 account whether the borrower could afford the substantially higher payment that would
454 inevitably be required during the remaining term of the loan.

455    With respect to HELOCs, Defendants underwrote and approved such loans based only on the
456    borrower's ability to afford the interest-only payment during the initial draw period of the loan,
457    rather than on the borrower's ability to afford the subsequent, fully amortized principal and
458    interest payments.

459    As Defendants pushed to expand market share, they eased other basic underwriting standards.
460    For example, higher loan-to-value (LTV) and combined loan-to-value (CLTV) ratios were
461    allowed. Likewise, higher debt-to-income (DTI) ratios were allowed. At the same time that they
462    eased underwriting standards the Defendants also were encouraging consumers to go further into
463    debt in order to supply the very lucrative aftermarket of mortgage backed securities. The relaxed
464    underwriting standards created the aftermarket supply they needed. As a result, the Defendants
465    made it easy for the unwary consumer to take on more debt than he could afford by encouraging
466    unsound financial practices, all the while knowing defaults would occur more and more
467    frequently as the credit ratios of citizens reached the limit of the new relaxed underwriting
468    standards.

469    Defendants knew, or in the exercise of reasonable care should have known, from its own
470    underwriting guidelines industry standards that it was accumulating and selling/reselling risky
471    loans that were likely to end up in default. However, as the pressure mounted to increase market
472    share and originate more loans, Defendants began to grant "exceptions" even to its relaxed
473    underwriting guidelines. Such was the environment that loan officers and underwriters were,
474    from time to time, placed in the position of having to justify why they did not approve a loan that
475    failed to meet underwriting criteria.

476    **Risk Layering**

477    Defendants compromised its underwriting even further by risk layering, i.e. combining high risk
478    loans with one or more relaxed underwriting standards.

479    Defendants knew, or in the exercise of reasonable care should have known, that layered risk
480    would increase the likelihood of default. Among the risk layering Defendants engaged in were
481    approving ARM loans with little to no down payment, little to no documentation, and high
482    DTI/LTV/CLTV ratios. Despite such knowledge, Defendants combined these very risk factors in
483    the loans it promoted to borrowers.

484    Loan officers and mortgage Agents aided and abetted this scheme by working closely with other

485    mortgage Lenders/mortgage bankers to increase loan originations, knowing or having reason to

486    believe that Defendants and other mortgage Lenders/mortgage bankers with whom they did

487    business ignored basic established underwriting standards and acted to mislead the borrower, all

488    to the detriment of the borrower and the consumer of loan products..

489    Petitioner is informed and believe, and on that basis allege, that Defendants, and each of them,

490    engaged and/or actively participated in, authorized, ratified, or had knowledge of, all of the

491    business practices described above in paragraphs 30-42 of this Complaint

492    ***UNJUST ENRICHMENT***

493    Petitioner is informed and believes that each and all of the Defendants received a benefit at

494    Petitioner's expense, including but not limited to the following: To the Agent, commissions,

495    yield spread premiums, spurious fees and charges, and other "back end" payments in amounts to

496    be proved at trial; To the originating Lender, commissions, incentive bonuses, resale premiums,

497    surcharges and other "back end" payments in amounts to be proved at trial; To the investors,

498    resale premiums, and high rates of return; To the servicers including EMS, servicing fees,

499    percentages of payment proceeds, charges, and other "back end" payments in amounts to be

500    proved at trial; To all participants, the expectation of future revenues from charges, penalties and

501    fees paid by Petitioner when the unaffordable LOAN was foreclosed or refinanced.

502    By their misrepresentations, omissions and other wrongful acts alleged heretofore, Defendants,

503    and each of them, were unjustly enriched at the expense of Petitioner, and Petitioner was unjustly

504    deprived, and is entitled to restitution in the amount of $2,110,217.46

505    ***CLAIM TO QUIET TITLE.***

506    Petitioner properly averred a claim to quiet title. Petitioner included both the street address, and

507    the Assessor's Parcel Number for the property. Petitioner has set forth facts concerning the title

508    interests of the subject property. Moreover, as shown above, Petitioner's claims for rescission

509    and fraud are meritorious. As such, Petitioner's bases for quiet title are meritorious as well.

510    Defendants have no title, estate, lien, or interest in the Subject Property in that the purported

511    power of sale contained in the Deed of Trust is of no force or effect because Defendants' security

512    interest in the Subject Property has been rendered void and that the Defendants are not the holder

513 in due course of the Promissory Note. Moreover, because Petitioner properly pled all Defendants'
514 involvement in a fraudulent scheme, all Defendants are liable for the acts of its co-conspirators,

515 "a Petitioner is entitled to damages from those Defendants who concur in the tortuous
516 scheme with knowledge of its unlawful purpose." *Wyatt v. Union Mortgage Co., 24 Cal.*
517 *3d 773, 157 Cal. Rptr. 392, 598 P.2d 45 (1979); Novartis Vaccines and Diagnostics, Inc.*
518 *v. Stop Huntingdon Animal Cruelty USA, Inc., 143 Cal. App. 4th 1284, 50 Cal. Rptr. 3d*
519 *27 (1st Dist. 2006); Kidron v. Movie Acquisition Corp., 40 Cal. App. 4th 1571, 47 Cal.*
520 *Rptr. 2d 752 (2d Dist. 1995).*

521 ### SUFFICIENCY OF PLEADING

522 Petitioner has sufficiently pled that relief can be granted on each and every one of the
523 Complaint's causes of action. A complaint should not be dismissed "unless it appears beyond
524 doubt that the Petitioner can prove no set of facts in support of Petitioner claim which would
525 entitle Petitioner to relief." *Housley v. U.S. (9th Cir. Nev. 1994) 35 F.3d 400, 401.* "All
526 allegations of material fact in the complaint are taken as true and construed in the light most
527 favorable to Petitioner." *Argabright v. United States, 35 F.3d 1476, 1479 (9th Cir. 1996).*

528 Attendant, the Complaint includes a "short, plain statement, of the basis for relief." Fed. Rule Civ. Proc.
529 8(a). The Complaint contains cognizable legal theories, sufficient facts to support cognizable legal
530 theories, and seeks remedies to which Petitioner is entitled. *Balistreri v. Pacifica Police Dept., 901 F.2d*
531 *696, 699 (9th Cir. 1988); King v. California, 784 F.2d 910, 913 (9th Cir. 1986).* Moreover, the legal
532 conclusions in the Complaint can and should be drawn from the facts alleged, and, in turn, the court
533 should accept them as such. *Clegg v. Cult Awareness Network, 18 F.3d 752* (9th Cir, 1994). Lastly,
534 Petitioner's complaint contains claims and has a probable validity of proving a "set of facts" in support of
535 their claim entitling them to relief. *Housley v. U.S. (9th Cir. Nev. 1994) 35 F.3d 400, 401.* Therefore,
536 relief as requested herein should be granted.

537 ### CAUSES OF ACTION

538 ### BREACH OF FIDUCIARY DUTY

539 Defendants Agent, appraiser, trustee, Lender, et al, and each of them, owed Petitioner a fiduciary
540 duty of care with respect to the mortgage loan transactions and related title activities involving
541 the Trust Property.

542 Defendants breached their duties to Petitioner by, *inter alia,* the conduct described above. Such
543 breaches included, but were not limited to, ensuring their own and Petitioners' compliance with
544 all applicable laws governing the loan transactions in which they were involved, including but
545 not limited to, TILA, HOEPA, **RESPA** and the Regulations X and Z promulgated there under.

546 Defendant's breaches of said duties were a direct and proximate cause of economic and non-
547 economic harm and detriment to Petitioner(s).

548 Petitioner did suffer economic, non-economic harm, and detriment as a result of such conduct,
549 all to be shown according to proof at trial of this matter.

550 *CAUSE OF ACTION - NEGLIGENCE/NEGLIGENCE PER SE*

551 Defendants owed a general duty of care with respect to Petitioners, particularly concerning their
552 duty to properly perform due diligence as to the loans and related transactional issues described
553 hereinabove.

554 In addition, Defendants owed a duty of care under TILA, HOEPA, **RESPA** and the Regulations
555 X and Z promulgated there under to, among other things, provide proper disclosures concerning
556 the terms and conditions of the loans they marketed, to refrain from marketing loans they knew
557 or should have known that borrowers could not afford or maintain, and to avoid paying undue
558 compensation such as "yield spread premiums" to mortgage Agents and loan officers.

559 Defendants knew or in the exercise of reasonable care should have known, that the loan
560 transactions involving Petitioner and other persons similarly situated were defective, unlawful,
561 violative of federal and state laws and regulations, and would subject Petitioner to economic and
562 non-economic harm and other detriment.

563 Petitioner is among the class of persons that TILA, HOEPA, **RESPA** and the Regulations X and
564 Z promulgated there under were intended and designed to protect, and the conduct alleged
565 against Defendants is the type of conduct and harm which the referenced statutes and regulations
566 were designed to deter.

567 As a direct and proximate result of Defendant's negligence, Petitioner suffered economic and
568 non-economic harm in an amount to be shown according to proof at trial.

569    *AGENT: COMMON LAW FRAUD*

570    If any Agents' misrepresentations made herein were not intentional, said misrepresentations were
571    negligent. When the Agents made the representations alleged herein, he/she/it had no reasonable
572    ground for believing them to be true.

573    Agents made these representations with the intention of inducing Petitioner to act in reliance on
574    these representations in the manner hereafter alleged, or with the expectation that Petitioner
575    would so act.

576    Petitioner is informed and believes that Agent et al, facilitated, aided and abetted various Agents
577    in their negligent misrepresentation, and that various Agents were negligent in not implementing
578    procedures such as underwriting standards oversight that would have prevented various Agents
579    from facilitating the irresponsible and wrongful misrepresentations of various Agents to
580    Defendants.

581    Petitioner is informed and believes that Agent acted in concert and collusion with others named
582    herein in promulgating false representations to cause Petitioner to enter into the LOAN without
583    knowledge or understanding of the terms thereof.

584    As a proximate result of the negligent misrepresentations of Agents as herein alleged, the
585    Petitioner sustained damages, including monetary loss, emotional distress, loss of credit, loss of
586    opportunities, attorney fees and costs, and other damages to be determined at trial. As a
587    proximate result of Agents' breach of duty and all other actions as alleged herein, Plaintiff has
588    suffered severe emotional distress, mental anguish, harm, humiliation, embarrassment, and
589    mental and physical pain and anguish, all to Petitioner's damage in an amount to be established
590    at trial.

591    *PETITIONER PROPERLY AVERRED A CLAIM FOR BREACH OF THE IMPLIED*
592    *COVENANT OF GOOD FAITH AND FAIR DEALING.*

593    Petitioner properly pled Defendants violated the breach of implied covenant of good faith and
594    fair dealing. "Every contract imposes upon each party a duty of good faith and fair dealing in its
595    performance and its enforcement." *Price v. Wells Fargo Bank, 213 Cal.App.3d 465, 478, 261*
596    *Cal. Rptr. 735 (1989);* Rest.2d Contracts § 205. A mortgage Agent has fiduciary duties. *Wyatt v.*

597 *Union Mortgage Co., (1979) 24 Cal. 3d. 773.* Further, In *Jonathan Neil & Associates, Inc. v*
598 *Jones, (2004) 33 Cal. 4th 917,* the court stated:

599 In the area of insurance contracts the covenant of good faith and fair dealing has taken on a
600 particular significance, in part because of the special relationship between the insurer and the
601 insured. The insurer, when determining whether to settle a claim, must give at least as much
602 consideration to the welfare of its insured as it gives to its own interests. . . The standard is
603 premised on the insurer's obligation to protect the insured's interests . . . *Id. at 937.*

604 Likewise, there is a special relationship between an Agent and borrower. "A person who
605 provides Agency services to a borrower in a covered loan transaction by soliciting Lenders or
606 otherwise negotiating a consumer loan secured by real property, is the fiduciary of the
607 consumer...this fiduciary duty [is owed] to the consumer regardless of whom else the Agent may
608 be acting as an Agent for . . . The fiduciary duty of the Agent is to deal with the consumer in
609 *good faith.* If the *Agent knew or should have known that the Borrower will or has a likelihood of*
610 *defaulting ... they have a fiduciary duty to the borrower not* to place them in that loan."
611 (California Department of Real Estate, *Section 8: Fiduciary Responsibility,* www.dre.ca.gov).
612 [*Emphasis Added*].

613 All Defendants, willfully breached their implied covenant of good faith and fair dealing with
614 Petitioner when Defendants: (1) Failed to provide all of the proper disclosures; (2) Failed to
615 provide accurate Right to Cancel Notices; (3) Placed Petitioner into Petitioner's current loan
616 product without regard for other more affordable products; (4) Placed Petitioner into a loan
617 without following proper underwriting standards; (5) Failed to disclose to Petitioner that
618 Petitioner was going to default because of the loan being unaffordable; (6) Failed to perform
619 valid and /or properly documented substitutions and assignments so that Petitioner could
620 ascertain Petitioner rights and duties; and (7) Failed to respond in good faith to Petitioner's
621 request for documentation of the servicing of Petitioner's loan and the existence and content of
622 relevant documents. Additionally, Defendants breached their implied covenant of good faith and
623 fair dealing with Petitioner when Defendants initiated foreclosure proceedings even without the
624 right under an alleged power of sale because the purported assignment was not recorded and by
625 willfully and knowingly financially profiting from their malfeasance. Therefore, due to the
626 special relationship inherent in a real estate transaction between Agent and borrower, *and* all
627 Defendants' participation in the conspiracy, the Motion to Dismiss should be denied.

628    *CAUSE OF ACTION VIOLATION OF TRUTH IN LENDING ACT 15 U.S.C. §1601 ET*
629    *SEQ*

630    Petitioner hereby incorporates by reference, re-pleads and re-alleges each and every allegation
631    contained in all of the paragraphs of the General Allegations and Facts Common to All Causes of
632    Action as though the same were set forth herein.

633    Petitioner is informed and believes that Defendant's violation of the provisions of law rendered
634    the credit transaction null and void, invalidates Defendant's claimed interest in the Subject
635    Property, and entitles Petitioner to damages as proven at trial.

636    *INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS*

637    The conduct committed by Defendants, driven as it was by profit at the expense of increasingly
638    highly leveraged and vulnerable consumers who placed their faith and trust in the superior
639    knowledge and position of Defendants, was extreme and outrageous and not to be tolerated by
640    civilized society.

641    Defendants either knew that their conduct would cause Petitioner to suffer severe emotional
642    distress, or acted in conscious and/or reckless disregard of the probability that such distress
643    would occur.

644    Petitioner did in fact suffer severe emotional distress as an actual and proximate result of the
645    conduct of Defendants as described hereinabove.

646    As a result of such severe emotional distress, Petitioner suffered economic and non economic
647    harm and detriment, all to be shown according to proof at trial of this matter.

648    Petitioner demands that Defendants provide Petitioner with release of lien on the lien signed by
649    Petitioner and secure to Petitioner quite title;

650    Petitioner demands Defendants disgorge themselves of all enrichment received from Petitioner
651    as payments to Defendants based on the fraudulently secured promissory note in an amount to be
652    calculated by Defendants and verified to Petitioner;

653    Petitioner further demands that Defendants pay to Petitioner an amount equal to treble the
654    amount Defendants intended to defraud Petitioner of which amount Petitioner calculated to be
655    equal to $6,330,652.38

PRELIMINARY INJUNCTION          23 of 26

656 **REQUEST FOR TEMPORARY INJUNCTION**

657 Plaintiff will suffer imminent and irreparable injury if defendant is not enjoined from
658 foreclosing on the property owned by Plaintiff. Fed. R. Civ. P. 65(b)(1); *see Sampson v. Murray*,
659 415 U.S. 61, 88-89 & n.59, 94 S. Ct. 937, 951-52 & n.59 (1974).

660 There is no adequate remedy at law because once the foreclosure sale has taken place
661 Plaintiff will suffer the complete loss of the property as defendant will sell the property to a third
662 party who will have a right to possession without regard to the claims Plaintiff has against
663 defendant. {*See N. Cal. Power Agency v. Grace Geothermal Corp., 469 U.S. 1306, 1306, 105 S.*
664 *Ct. 459, 459 (1984); Wilson v. Ill. S. Ry. Co., 263 U.S. 574, 576-77, 44 S. Ct. 203, 203-04*
665 *(1924); Winston v. Gen. Drivers, Warehousemen & Helpers Local Un. No. 89, 879 F. Supp. 719,*
666 *725 (W.D. Ky. 1995.*

667 There is a substantial likelihood that plaintiff will prevail on the merits. *Schiavo v. Schiavo*,
668 403 F.3d 1223, 1225 (11th Cir. 2005). Plaintiff will be able to show that:

669 • that the alleged real party in interest is unable to prove standing to foreclose against
670 and sell the property;

671 • Defendant has no agency to represent the real party in interest;

672 • that the lender committed numerous acts, as listed above, that have the effect of
673 rendering the contract, through which defendant claims authority, void and
674 unenforceable.

675 The threatened harm to plaintiff outweighs the harm that a preliminary injunction would
676 inflict on defendant. *Schiavo*, 403 F.3d at 1225-26. If defendant is temporarily restrained from
677 selling the instant property, the defendant and plaintiff will benefit as if plaintiff is forced to
678 vacate the property, the property will sit empty for the duration of the action. Plaintiff will suffer
679 loss of the use of said property and will loose opportunity to maintain same and defendant will
680 suffer loss by having to maintain an empty property that cannot be insured.

681 Issuance of a preliminary injunction would not adversely affect the public interest and public
682 policy because there are already a great number of empty houses with the current residential
683 foreclosure mess. Adding more will simply increase the burden on the local as it will create
684 opportunity for vandalism and further other criminal activity.

Case 2:10-cv-04244-JS -ARL Document 3 Filed 09/17/10 Page 25 of 26

685     Plaintiff is willing to post a bond in the amount the court deems appropriate.

686     The court should enter this preliminary injunction without notice to defendant because
687 plaintiff will suffer immediate and irreparable injury, loss, or damage if the order is not granted
688 before defendant can be heard as **defendant has scheduled the above referenced sale for the**
689 **week of October 4th, 2010.** *First Tech. Safety Sys. v. Depinet*, 11 F.3d 641, 650 (6th Cir.
690 1993). If said sale is allowed to take place, Plaintiff will be irreparably harm. {*See O'Connor's*
691 *Federal Rules, "Ex parte," ch. 2-D, §3.1.3, p. 77.*}

692     Plaintiff asks the court to set the request for a preliminary injunction for hearing at the
693 earliest possible time.

694                                  **CONCLUSION**

695     13. Plaintiff has filed suit against defendant wherein Plaintiff has claimed numerous causes
696 of action against defendant. A number of the allegations made by Plaintiff are incontrovertable
697 by defendant, therefore, Plaintiff will prevail on a number of the above allegations by way if
698 existing records. For these reasons, plaintiff asks the court to issue a preliminary injunction
699 preventing defendant from foreclosing on the property.

700                                     **PRAYER**
701     15. For these reasons, plaintiff asks that the court do the following:

702     a.  Defendant be prevented from foreclosing on and selling the property until and
703         unless defendant prevails in the current litigation.

704     b.  Enter judgment for plaintiff.

705     c.  Award costs of court.

706     d.  Grant any other relief it deems appropriate.

707 Respectfully Submitted,
708
709
710 Rodney Chestnut          Dawn Chestnut
711

PRELIMINARY INJUNCTION          25 of 26

712    **VERIFICATION**

713

714

715    We, Rodney & Dawn Chestnut , do swear and affirm that all statements made herein are true
716    and accurate, in all respects, to the best of my knowledge.

717    Rodney & Dawn Chestnut
718    112 W Bartlett Road
719    Middle Island , NY
720
721
722
723    **Rodney & Dawn Chestnut**
724
725
726    The Person above, who proved to me on the basis of satisfactory evidence to be the person

727    whose name is subscribed to this document and acknowledged to me that he/she executed the

728    same in his authorized capacity and that by his signature on this instrument who is the person

729    who executed this instrument.

730    I certify under PENALTY OF PERJURY under the laws of this State that the foregoing

731    paragraph is true and correct.

732

733    Witness my hand and official seal.

734

735    _____

736    **NOTARY PUBLIC IN AND FOR**

737    **THE STATE OF NEW YORK**

738

TINA M. AMALFITANO
Notary Public, State of New York
No. 01AM5085240
Qualified in Suffolk County
Commission Expires Sept. 15, 20
**Notary Seal**

FILED
IN CLE...
U S DISTRICT COURT E.D.N.Y

★    SEP 17 2010    ★

LONG ISLAND OFFICE